UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| CHERYL SIMPSON, | ) |
| Plaintiff, | ) ) ) |
| vs. | )  Case No. 1:14-CV-13 (CEJ) ) |
| COUNTY OF CAPE GIRARDEAU, MISSOURI, | ) ) ) |
| Defendant. | ) ) |

**<u>MEMORANDUM</u>**

On January 1, 2014, the Cape Girardeau County jail imposed a "postcard only" policy for non-privileged correspondence to its inmates. Plaintiff Cheryl Simpson brings this action pursuant to 42 U.S.C. § 1983, claiming that the policy impermissibly restricts the ability of outside correspondents to communicate with inmates, in violation of the First and Fourteenth Amendment. Plaintiff seeks declaratory and injunctive relief.

The parties appeared for a bench trial on November 6, 2015. After considering the evidence presented and the parties' stipulation of facts, the Court makes findings of fact and conclusions of law as required by Rule 52(a)(1) of the Federal Rules of Civil Procedure.

**I.  Findings of Fact**

Plaintiff's son, Trey Simpson, was an inmate at the Cape Girardeau County jail from August 2013 to February 2014. Joint Stip. at ¶2. [Doc. #46]. The jail is a transitional or temporary facility that houses approximately 220 male and female inmates in ten pods, with an average count of 207 inmates. Joint Stip. at ¶29; Transcript at 85. The typical length of stay is less than six months. Joint Stip. at

¶32. The jail is staffed in two shifts, with four corrections officers on each shift. One officer remains stationed at a computer monitor and operates the facility's doors. The remaining officers are responsible for booking prisoners into the jail, releasing prisoners, making security checks of the pods and perimeter, responding to disturbances, handling medical and commissary requests, transporting inmates to medical visits and court, serving meals, processing civilian fingerprints, and handling incoming mail.[1] Transcript at 84-85. Although outgoing mail should be scanned, jail personnel rarely have enough time to do so. Transcript at 89.

### A. The Jail's Mail Policy

Before the jail implemented the postcard-only policy on January 1, 2014, there were no limits on the number or length of individual letters an inmate could receive. Between 50 and 100 letters were received each day. Transcript at 110; but see Transcript at 121 (Mulcahy estimated the jail received between 50 and 150 pieces of mail every day). All nonprivileged[2] mail was opened by corrections officers, who scanned the contents for information about escape plans or threats to other inmates. Transcript at 83-84. The officers also searched for contraband — such as tobacco, drugs,[3] or lewd photographs — and other items that pose a security risk — such as paperclips, staples and rubber bands. See Transcript at 81

---

[1] In its proposed findings of facts, defendant states that the corrections officers also process grievances, "deal with the public," and "do court supervision." [Doc. #73 at ¶11]. While it is logical that jail personnel would perform these duties, there is no evidence in the record from which the Court can make a finding that these duties are in fact performed.

[2] The postcard-only policy does not apply to mail from religious institutions, attorneys, and courts. Transcript at 87-88. That mail is opened in front of inmates and items such as staples and paperclips are removed. Transcript at 112.

[3] Defendant has not identified any documented instances of drugs or tobacco being found in nonprivileged mail, although these items have been found in envelopes purporting to be legal (*i.e.,* privileged) mail. Transcript at 81, 101, 132, 137.

(staples can be used to make tattoos), 115-17 (rubber bands can be used to tie sheets together or make zip guns; paperclips can be used to make handcuff keys). In addition, officers searched for newspaper and magazine articles and court documents that referred to other inmates. Transcript at 80, 82, 133 (outside correspondents sent criminal history information of other inmates). Where possible, articles and court documents were returned to the sender. Transcript at 133. Finally, any personal property items included in the mail were labeled and placed in storage to be given to the inmate upon release. Transcript at 94, 121. Captain James Mulcahy testified that it could take one or two officers 35 to 45 minutes of uninterrupted time to process the "normal mail load," and up to two hours to do so "on a bad day." Transcript at 142. He acknowledged, however, that this was an educated guess because the jail did not keep records of how long it took to process the mail. Transcript at 140.

In October 2013, Lieutenant Todd Stevens proposed changing the policy regarding incoming mail to limit nonprivileged correspondence to postcards. Plaintiff's Ex. 7. He identified the following benefits of such a policy: (1) "a higher level of safety and security" at the jail; (2) "possibly less mail coming into the facility;" (3) "less contraband introduced" into the jail; (4) "less manpower spent opening and searching mail;" and (5) reduced liability for "missing property that is mailed into the facility and cannot be given to the inmate." He identified possible disadvantages as well: (1) complaints from inmates and their families; (2) "[m]ost postcards are thick and could be used for picking locks and making other forms of contraband;" and (3) legal challenges to the policy. Id. He noted that the policy had been adopted by "several" Missouri sheriffs' offices. Id.

3

The policy went into effect on January 1, 2014. Its stated purpose is to "expand the safety and security" for "inmates and Staff." All nonprivileged correspondence entering the jail must be written on "standard white postcards" no larger than 5" by 7" and include a legible return address. Plaintiff's Ex. 1, Policy at § I. "Unacceptable" postcards — *i.e.*, index cards, photographs, and postcards that are defaced or altered; depict nudity, weapons, alcohol or gang references; or have labels, stickers, stains, watermarks, or "biohazards, including lipsticks or perfumes" — are returned to the sender. All stamps are removed and discarded before the cards are given to the inmate. While an inmate may receive an unlimited number of postcards, he may keep only ten postcards in his cell. Id. According to the policy, incoming postcards are monitored "to ascertain any attempt at escape, security violations, or conspiracy to introduce contraband." Id. at § III(a)(4). In the event that such information is found, the inmate is "given written notice of the reasons the correspondence is being denied." Id. at § III(a)(5). The postcard-only policy does not apply to outgoing mail. Transcript at 89.

The policy sets forth an exception for legal and religious mail. Policy at III(a)(1)(b). Legal mail includes "anything from attorneys [or] courts," while privileged religious mail must come from a religious institution. Transcript at 87-88. All privileged mail is opened by jail staff in the presence of the receiving inmate. Transcript at 53, 77. In addition to the official exceptions for legal and religious mail, the evidence establishes that the jail has unwritten exceptions. Upon written request, Stevens and Mulcahy can authorize inmates to receive letters from family members who cannot obtain postcards because they are incarcerated. Transcript at 87. In addition, inmates representing themselves in civil or criminal matters may

4

request permission to receive legal materials from family members.[4] Transcript at 102-03, 128-29. Mulcahy acknowledged that "not everyone know[s] that they can" receive legal materials through the mail from family. Transcript at 122. There was no testimony on whether the jail intends to update the written policy to include these exceptions.

Since the postcard-only policy was implemented, the jail receives about 50 postcards a day. Transcript at 111. For each postcard, corrections officers remove the stamp, scan the contents,[5] log its receipt, and deliver it to the receiving inmate. Transcript at 94. It takes an average of 30 to 45 minutes to complete distribution of the postcards. Transcript at 134.

On March 15, 2014, the jail implemented a policy allowing inmates to receive personal emails and photographs, for a cost of $.35 for each email and $.50 for each photograph. Transcript at 90. Emails are limited to 500 words or fewer; photographs depicting nudity, weapons, alcohol or gang references are not allowed. Corrections officers scan incoming emails for prohibited content and print them. The printed emails are given to the inmates if they have enough money in a commissary account to pay for them; otherwise, the emails are held in a file until there are funds to pay for them. Transcript 108-10. The jail receives about 100 emails a day for inmates.

There was testimony at trial that the jail planned to make videoconferencing available to inmates in late 2015. Transcript at 91. In contrast to the visitation

---

[4] The public defender's office also provides legal materials to *pro se* criminal defendants. Transcript at 128-29.

[5] The parties jointly stipulated that the postcards are not "read." Joint Stip. at ¶28. Based on this stipulation, plaintiff suggests that the policy actually increases the risk that information about other inmates or escape plans will go undetected. Doc. #74 at 23. The testimony establishes that both before and after the implementation of the postcard-only policy jail personnel "scanned" the contents of written communications for such information.

policy, videoconferences will not be restricted to immediate family members. Videoconferences can be placed for free from kiosks in the jail's lobby or from home computers or mobile devices for a charge of $5.00 for 15 minutes. Transcript at 118-20.

## B. Plaintiff's Communications with Her Son

Trey Simpson was incarcerated from August 2013 to February 2014. Before the postcard-only policy was implemented, plaintiff sent him three or four lengthy letters every week in which she addressed personal, legal, and financial matters. She also sent photographs and pictures drawn by her son's young nephew. Several other relatives and friends also wrote letters to Mr. Simpson. Mr. Simpson testified that this correspondence was important to him, and helped him to "stay focused on what really matters, which was bettering [him]self and bringing [him]self to be completely ready and at [his] best" when he was released. Transcript at 36.

After the policy went into effect, plaintiff wrote about 60 postcards and her husband wrote at least 50. Transcript at 15, 61. Although the policy permits "standard white postcards" up to 5" by 7" in size, plaintiff was unable to locate any postal cards larger than 3.5" by 5." Transcript at 24. She testified that she could only fit about a single paragraph on each card and so she had to write multiple postcards to convey what she previously was able to write in a single letter. Transcript at 15. She numbered the postcards so her son would be able to read them in order. Id. However, the postcards did not always arrive at the same time and, if he already had ten cards in his possession, he was required to turn those in before he could receive the most recent cards. As a result, the communications "got very confusing." Transcript at 37-38. Plaintiff testified that she limited the content

6

of what she wrote on the postcards because she was aware that they could be read by anyone who handled them from the time she put them in the mail until they were placed in her son's hands, including postal employees. Transcript at 16. Plaintiff testified that the postcard-only policy interfered with her ability to maintain the strong connection she felt was necessary for her son to "get back into society" when he was released. Transcript at 16-17.

Immediate family members are allowed to have 15-minute visits with inmates on Saturdays. Transcript at 19. Plaintiff visited her son every Saturday; her husband, who worked on Saturdays, visited less often. Transcript at 20, 44, 63. Visits were conducted in a small cubicle over telephone handsets on either side of a glass wall, with up to seven inmates receiving visitors at a time. Transcript at 21. It was not possible to have private communication with an inmate under these conditions. Plaintiff testified that the handsets frequently malfunctioned. When that occurred, she had to wait for the next 15-minute period and try a different handset. Transcript at 20-22. Coordinating weekly visits was complicated by the fact that, on six occasions, Trey Simpson was moved to a new housing pod with a different designated visiting hour. After each move, he placed a collect call to his parents to let them know his new visiting hour. Transcript 42-45. Each call cost $9.99 for 10 minutes. Transcript at 17-18. Because of the expense, he only called his parents once a week. Transcript at 29.

## II.  Conclusions of Law

### A.  Prison Regulation of Inmate Correspondence

Both the addressee and the sender of direct personal correspondence are protected by the First Amendment against unjustified governmental interference

7

with communication. Procunier v. Martinez, 416 U.S. 396, 408–09 (1974) (addressing challenge to prison censorship regulations) (overruled in part by Thornburgh v. Abbott, 490 U.S. 401 (1989)). However, "the Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere." Beard v. Banks, 548 U.S. 521, 528 (2006) (upholding prison ban on newspapers, magazines, and photographs). To ensure that appropriate deference is afforded to prison officials, courts consider prison regulations alleged to infringe constitutional rights under a "reasonableness" test that is less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987). Thus, prison regulations that restrict freedom of speech are permissible if they are "reasonably related to legitimate penological interests and are not an exaggerated response to such objectives." Turner v. Safley, 482 U.S. 78, 87 (1987).

To determine if a jail's content-neutral regulation is "reasonably related to legitimate penological interests," the Court examines four factors outlined by the Supreme Court in Turner: (1) whether the regulation has a "valid, rational connection" to a legitimate governmental interest; (2) whether alternative means are open to inmates to exercise the asserted right; (3) what impact an accommodation of the right would have on guards and inmates and prison resources; and (4) whether there are "ready alternatives" to the regulation. Overton v. Bazzetta, 539 U.S. 126, 132 (2003) (quoting Turner, 482 U.S. at 89-91). In conducting the Turner analysis, courts must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for

determining the most appropriate means to accomplish them. Id. (citations omitted). The burden, moreover, is not on state officials to prove the validity of prison regulations but on the prisoner to disprove it. Id. (citations omitted).

Nonetheless, despite the "considerable deference" afforded to prison administrators, the Turner test "is not toothless." Prison Legal News v. Chapman, 44 F. Supp. 3d 1289, 1298 (M.D. Ga. 2014) (quoting Thornburgh, 490 U.S. at 407-08. Prison authorities must "show more than a formalistic logical connection between a regulation and a penological objective"; they must also "show[ ] a reasonable relation" in light of the "importance of the rights . . . at issue." Id. at 1298 (quoting Beard, 548 U.S. at 533, 535). A prison regulation "cannot be sustained when the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary and irrational." Id. (quoting Turner, 482 U.S. at 89-90).

### B. Other Postcard-Only Policies

Although the Eighth Circuit has not yet addressed the constitutionality of postcard-only policies, several district courts in other circuits have done so and have reached differing conclusions. Compare Prison Legal News v. Columbia Cty., 942 F. Supp. 2d 1068, 1086 (D. Or. 2013) (finding that a postcard-only policy was not rationally related to legitimate penological interests where "there [was] no evidence that a postcard-only policy [was] more secure than opening envelopes and inspecting their contents" and where "the time-savings afforded to the Jail by the postcard-only mail policy [was] *de minimis*"), and Cox v. Denning, No. 12–2571–DJW, 2014 WL 4843951, at *17-19 (D. Kan. Sept. 29, 2014) (holding same where there was no explanation how postcard-only policy "more effective at

9

preventing the introduction of contraband than the former policy of opening envelopes and inspecting the contents" and no evidence regarding the amount of time saved by the postcard-only policy), with Barnes v. Wilson, 110 F. Supp. 3d 624, 632 (D. Md. 2015) (upholding postcard-only policy that did not apply to legal communications or prevent all avenues of communication, and inmate's stay in facility was "transitional and temporary"); Chapman, 44 F. Supp. 3d at 1299 (holding after bench trial that postcard-only policy was constitutional); Covell v. Arpaio, 662 F. Supp. 2d 1146, 1153-55 (D. Ariz. 2009) (finding that metered-postcard-only policy rationally related to legitimate interest in reducing contraband where evidence showed that previous increase in attempted smuggling of contraband through the back of postage stamps), and Althouse v. Palm Beach Cty. Sheriff's Office, No. 12–80135–CIV, 2013 WL 536072, at *5-6 (S.D. Fla. Feb. 12, 2013) (finding that postcard-only policy rationally connected to security where evidence showed that envelopes and greeting cards frequently contained hidden contraband).

### C. The Cape Girardeau Jail Policy

The objectives of the defendant's postcard-only policy are to increase safety and security within the jail by limiting the introduction of contraband and reducing the amount of time jail staff spend dealing with incoming mail.[6] Increasing security, reducing contraband, and decreasing the time spent screening mail are valid governmental interests. See Pell v. Procunier, 417 U.S. 817, 823 (2000) ("[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves."); Goff v. Graves, 362 F.3d 543, 549

---

[6] The Court declines to address the additional objective of relieving the jail of liability for missing personal property as unnecessary to the analysis.

(8th Cir. 2004) (keeping contraband out of secure unit is a valid penological interest); Weiler v. Purkett, 137 F.3d 1047, 1050 (8th Cir. 1998) (same); McKenzie v. Fabian, No. CIV. 07-4441 PAM/JSM, 2009 WL 2982641, at *10 (D. Minn. Sept. 11, 2009) (policy imposing weight limit on nonlegal mail rationally related to objectives of preventing contraband from entering the prison and preserving "finite resources of the prison"); Columbia Cty., 942 F. Supp. 2d at 1082 (addressing postcard-only policy and finding that "security and efficiency are legitimate penological objectives") (citations omitted).

Where, as here, policies implicate institutional security, courts "must accord great deference to the judgment of prison officials." Goff, 362 F.3d at 549. "The task of determining whether a policy is reasonably related to legitimate security interests is peculiarly within the province and professional expertise of corrections officials." Beaulieu v. Ludeman, 690 F.3d 1017, 1029 (8th Cir. 2012) (quoting Florence v. Bd. of Chosen Freeholders of Cty. of Burlington, 132 S. Ct. 1510, 1517 (2012)) (internal quotation and citation omitted). As a result, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters." Id. (citations omitted).

Addressing the first Turner factor, plaintiff argues that defendant cannot show that the policy has a "rational connection" to the goal of increasing safety and security because Mulcahy and Stevens gave vague or contradictory testimony regarding whether the policy resulted in less contraband, decreased the volume of incoming mail, or brought about time savings. However, case law does not require defendant to introduce "actual proof that a legitimate interest will be furthered by

11

the challenged policy. The connection between the two need be only objectively rational." Herlein v. Higgins, 172 F.3d 1089, 1091 (8th Cir. 1999) (upholding prison ban on music with explicit lyrics); see also Beard, 548 U.S. at 531 (relying on prison official's "views" to find rational connection between periodical ban and legitimate penological interest). Here, logic dictates that scanning postcards is more efficient than opening envelopes and scanning multipage letters for information regarding other inmates or escape plans. See Beard, 548 U.S. at 531-32 ("The articulated connections between newspapers and magazines, the deprivation of virtually the last privilege left to an inmate, and a significant incentive to improve behavior, are logical ones."); Chapman, 44 F. Supp. 3d at 1299 (noting "common sense connection" between goal of reducing contraband and limiting the number of pages of correspondence). In addition, the postcard-only policy minimizes the possibility that paperclips, rubber bands, staples, newspaper articles, and sentencing documents—all items which defendants established pose a risk to security and safety—will be introduced into the jail in envelopes. The fact that these items may still be introduced through privileged mail does not negate the fact that the policy reduces the volume of mail that must be searched for such items. See Ortiz v. Fort Dodge Corr. Facility, 368 F.3d 1024, 1027 (8th Cir. 2004) (rejecting plaintiff's argument that English-only correspondence rule was not rationally related to security interests because escape plans could be made through other means). The postcard-only policy satisfies the first Turner factor.

With regard to the second Turner factor, if inmates have alternative means to exercise the asserted right, "courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the

regulation.'" Turner, 482 U.S. at 90 (quoting Pell, 417 U.S. at 827). The alternatives to multipage letters that were available to plaintiff to engage in communication with her son included weekly visits and phone calls.[7] In addition, there were no restrictions on Trey Simpson's ability to mail letters to plaintiff. Plaintiff's testimony establishes that these alternative avenues were more expensive and made it difficult to convey private or confidential information. However, the proffered alternatives "need not be ideal . . .; they need only be available." Overton, 539 U.S. at 135. Where "the alternatives are of sufficient utility" they give "some support to the regulations." Id. Taking into account the additional expense and reduced privacy, the Court concludes that second Turner factor is neutral.

In considering the third Turner factor, courts should be "particularly deferential to the informed discretion of corrections officials" when accommodating an asserted right will have "a significant ripple effect on fellow inmates or on prison staff." Turner 482 U.S. at 90 (internal quotation omitted). Plaintiff argues that defendant should return to the pre-2014 policy of allowing unlimited incoming nonprivileged correspondence in sealed envelopes. As discussed above, incoming letters needed to be searched for prohibited items and information regarding other inmates. Time spent by the staff accomplishing these tasks reduced the amount of time spent on other tasks related to security and inmate welfare. See Perkins v. Demeyo, No. 2:12-CV-01242-JAD, 2014 WL 5782769, at *7 (D. Nev. Nov. 6, 2014) (finding third Turner factor satisfied based on "increased danger to inmates and staff caused by both the contraband itself and the staff time required to screen for

---

[7] The jail's email policy had not been implemented during Trey Simpson's incarceration and is not relevant to this case.

13

contraband"). Plaintiff argues that implementing the postcard-only policy imposes its own costs in terms of time and effort that effectively nullify any benefit. In particular, plaintiff cites the time necessary to return noncompliant postcards and inform outside correspondents of the restrictions. However, these tasks also needed to be performed under the pre-2014 policy and thus do not support plaintiff's position. Plaintiff also cites the time associated with implementing the limit on the number of postcards inmates could keep in their cells, but there is no evidence in the record regarding how burdensome it is to enforce this aspect of the postcard-only policy. The policy satisfies the third Turner factor.

Under the fourth Turner factor, if there is "an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Turner 482 U.S. at 91. As already discussed above, the alternative that plaintiff identifies — a return to the pre-2014 policy — has a more than *de minimis* cost in that it will require jail staff to open envelopes and inspect and scan multipage letters, the very activities which the postcard-only policy was designed to reduce.

\* \* \* \* \*

Based on the foregoing, the Court finds that defendant's postcard-only policy is reasonably related to legitimate penological interests. The Court further concludes that the policy does not violate the plaintiff's constitutional rights.

Having found the issues in favor of the defendant, the Court will enter judgment in favor of defendant and against plaintiff.

A separate judgment will accompany this Memorandum.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 16th day of August, 2016.